**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RAMZI YOSAF, | ) | |
| | ) | No. 2:22-1492 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Robert J. Colville |
| | ) | |
| UNIVERSITY OF PITTSBURGH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is a Motion for Summary Judgment (ECF No. 48) filed by Defendant in this matter. Defendant University of Pittsburgh ("Defendant" or, where appropriate, the "University") moves for summary judgment on all three counts in the Complaint (ECF No. 1) filed by Plaintiff Ramzi Yosaf ("Plaintiff"). The Court has subject matter jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331. The Motion has been fully briefed and is ripe for disposition.

## I. Factual Background & Procedural History

Unless otherwise noted, the following facts are not in dispute:

In 2011, Plaintiff Ramzi Yosaf, a Libyan national in the United States on a student visa, enrolled as a Ph.D. candidate at University of Pittsburgh Swanson School of Engineering. ECF Nos. 50 ¶ 4, 50-2 at 5, 56 ¶ 4. University of Pittsburgh has a statute of limitations dictating how long students have to complete all their degree requirement (the "Statute of Limitations"). ECF No. 57-5. Students at the University are subject to a ten-year Statute of Limitations to complete

Ph.D. studies and earn the degree, unless credit is given for a master's degree, in which case the Statute of Limitations is eight years. *Id.* The Statute of Limitations can be extended for up to two years if certain requirements are met. *Id.* If the extension is granted, that time is not counted toward the Statute of Limitations. *Id.* Because Plaintiff had earned a master's degree in civil and environmental engineering prior to matriculating at University of Pittsburgh, he was subject to an eight-year statute of limitations, meaning he would have to complete his studies and earn his degree by the summer of 2019, with the potential for a one-time extension of up to two years. ECF No. 57-3 at 14.

Plaintiff prepared his thesis proposal under the mentorship of Professor Morteza Torkamani ("Dr. Torkamani"). ECF Nos. 50 ¶ 16, 50-2 at 7; 56 ¶ 16. In April 2015, after Dr. Torkamani presented Plaintiff's thesis proposal at a faculty meeting, a professor in attendance, Dr. Kent Harries ("Dr. Harries"), recognized the proposal topic. ECF Nos. 50 ¶ 21; 56 ¶ 21. The University investigated the proposal and determined that it had been plagiarized. ECF Nos. 50 ¶ 23, 56 ¶ 23. There is dispute in the record as to whether Plaintiff was entirely responsible for the plagiarism, as Plaintiff's mentor, Dr. Torkamani, was also the mentor of the master's degree candidate who had previously submitted the same topic. *Id.* In any event, Plaintiff admitted that he did not properly cite what he believed to be the source material for his proposal. ECF Nos. 50-2 at 10, 57-3 at 32.

In December 2015, the University informed Plaintiff that he would be permitted to remain in the program, but that he was required to select a new thesis topic. ECF No. 50-5. In the letter describing the terms of this decision, Dr. Radisav Vidic ("Dr. Vidic") gave Plaintiff until the conclusion of the Spring 2016 term to meet the new requirements, or he would be

dismissed from the program. *Id.* Plaintiff signed the letter, indicating that he read and concurred with its contents. *Id.*

In May 2016, the dean of Defendant's School of Engineering, Gerald D. Holder ("Dean Holder"), sent Plaintiff a letter stating that because he had not secured a mentor for his continuing studies, the conditions of the December 2015 letter would be upheld, and Plaintiff would be dismissed from the program. ECF No. 57-13. On June 3, 2016, Plaintiff submitted an appeal letter. ECF Nos. 50-2 at 29, 55 at 9. There is an apparent dispute in the record as to what precisely the letter is appealing, but based on the order of events, it seems clear to the Court that this letter was meant to appeal the decision memorialized in Dean Holder's letter informing Plaintiff that he would be dismissed from the program. On June 20, 2016, Dean Holder sent Plaintiff another letter, indicating that, upon reconsideration, Plaintiff would be given an additional year to complete his proposal. ECF No. 50-7. Dean Holder's letter attached another letter from Dr. Vidic describing the terms of the University's decision, which included that Plaintiff would have to successfully present and defend a new Ph.D. proposal by August 31, 2017 and that Dr. Harries would serve as Plaintiff's advisor for this process. *Id.*

In September 2017, Plaintiff's thesis proposal passed. ECF Nos. 50 ¶ 47, 50-2 at 17, 56 ¶ 145, 57-3 at 73. And in November 2019, after a series of extensions and letters from Dr. Harries, Dr. Vidic, and the University Center for International studies reminding Plaintiff of his deadlines, Plaintiff defended his thesis proposal before a defense committee composed of Dr. Harries, Dr. Vidic, Dr. Jeen Shang Lin ("Dr. Lin"), and Dr. Julie Vandenbossche ("Dr. Vandenbossche"). ECF Nos. 50 ¶ 64, 56 ¶ 157. Contrary to the University's policy, all the members of the committee were members of the civil and environmental engineering

department. Ultimately, the committee determined that Plaintiff had failed his dissertation defense. ECF Nos. 50 ¶ 66, 56 ¶ 145.

Plaintiff appealed the failure of his dissertation defense. ECF Nos. 50 ¶ 69, 56 ¶ 166. The dean's office denied Plaintiff's appeal. ECF Nos. 50 ¶ 71, 56 ¶ 167. In January 2020, Plaintiff appealed the failure to the provost's office. ECF Nos. 50 ¶ 72, 56 ¶ 168. In this appeal, Plaintiff raised the issue of discrimination, specifically calling out his advisor, Dr. Harries, who, Plaintiff claimed "looked down" on him. ECF Nos. 50 ¶ 73, 56 ¶ 168.[1] In February 2020, Vice Provost Nathan Urban informed Plaintiff that because the composition of the defense committee did not comply with University policy, a new committee would be formed, to include at least one member from outside the engineering department, and Plaintiff would have until May 30, 2020 to defend his thesis before the newly formed committee. ECF Nos. 50 ¶ 79–80, 56 ¶ 169.

On May 18, 2020, Plaintiff defended his thesis again, this time before a committee composed of Dr. Harries, Dr. Lin, Dr. Vidic, Dr. Vandenbossche, and an outside faculty member, Dr. Albert To ("Dr. To"). ECF Nos. 50 ¶¶ 82–83, 56 ¶¶ 82–83; 172. Plaintiff again failed his defense. ECF Nos. 50 ¶ 84, 56 ¶ 172.

On May 20, 2020, Plaintiff emailed the provost's office arguing that the composition of his second defense committee was unfair, as it included members of the first committee who had violated the University's policy. ECF Nos. 56 ¶ 173, 63 ¶ 173. With only a few days remaining to meet the May 30, 2020 statute of limitations, by letter dated May 22, 2020, Dr. Vidic informed Plaintiff that he would not be able to revise his dissertation before the deadline, and that

[1] Notably, Plaintiff did not assert any specific form of race, religion, or nation of origin discrimination, and may even have asserted the opposite, claiming "I felt being discriminated against for no reason." ECF Nos. 50 ¶ 73, 56 ¶ 168. The Court understands that Plaintiff may have meant to accuse Dr. Harries of meritless, and not reasonless, discrimination, but the fact remains that this is not an indication that in January 2020, Plaintiff had already leveled a complaint of discrimination of a protected kind.

Plaintiff's tenure as a student at the University was being terminated. ECF Nos. 57-23, 56 ¶ 175, 63 ¶ 175.

On June 1, 2020, Plaintiff appealed the failure of his defense to the dean, again referencing the composition of the committee and again accusing Dr. Harries of discrimination against Plaintiff. ECF Nos. 50-18, 50 ¶¶ 86–87, 56 ¶¶ 86–87, 60 ¶ 176, 63 ¶ 176. Plaintiff's appeal was denied, and on September 25, 2020, he appealed to the Provost's Office. ECF Nos. 50-19, 50 ¶ 88, 56 ¶ 88. On October 23, 2020, the Provost's Office denied the appeal and dismissed Plaintiff from the program with no further internal appellate options. ECF Nos. 50-21, 50 ¶ 93, 56 ¶ 93.

On October 21, 2022, Plaintiff filed this lawsuit against Defendant, bringing claims for Discrimination and Retaliation under Title VI and a §1983 claim for First Amendment Retaliation. ECF No. 1. The parties engaged in discovery, and on April 25, 2025, Defendant filed a Motion for Summary Judgment (ECF No. 48), along with a Brief in Support (ECF No. 49) and a Concise Statement of Material Facts (ECF No. 50). On July 28, 2025, Plaintiff filed Brief in Opposition (ECF No. 55), along with a Counter Statement of Facts (ECF No.56). On September 10, 2025, Defendant filed a Reply (ECF No. 64) to Plaintiff's Response, along with a Response (ECF No. 63) to Plaintiff's Counter Statement of Facts.

## II. Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

"The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact." *Bavone v. Primal Vantage Co., Inc.*, No. 2:21cv1260, 2024 WL 756815, at *1 (W.D. Pa. Feb. 21, 2024). When the moving party carries this burden, the summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further:

> A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. See id. If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed. R. Civ. P. 56(e).

*Mahaven v. Pulaski Twp.*, 139 F. Supp. 2d 663, 664–65 (W.D. Pa. 2001), *aff'd*, 45 F. App'x 155 (3d Cir. 2002); *see also Bavone*, 2024 WL 756815, at *1 ("Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.").

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a *material fact*, that is, a fact that would affect the outcome of the suit under the governing substantive law, will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III. Discussion

### A. Count I – Discrimination Under Title VI

Plaintiff brings a claim for Race or National Origin Discrimination under Title VI of the Civil Rights Act of 1964. Defendant moves for summary judgment, arguing that Plaintiff has not plausibly alleged direct discrimination, and the evidence fails to meet the burden-shifting framework established under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To establish a *prima facie* case for Discrimination under Title VI, a plaintiff must allege that he "(1) was a member of a protected class, (2) qualified for the benefit or program at issue, (3) suffered an adverse action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Se. Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015); *Rightmyer v. Philly Pregnancy Ctr., P.C.*, 2024 WL 897983, at *3 (E.D. Pa. Mar. 1, 2024); *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016) (all citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014)). Once a plaintiff has established this *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse action]." *McDonnell Douglas*, 411 U.S. at 802. If the defendant does articulate a legitimate reason for the adverse

action, the burden shifts again to the plaintiff to show that the legitimate reason is a pretext for discrimination.

Defendant posits that the fourth element of the *prima facie* case, that the adverse action implies discrimination, is not met. As Defendant sees it, the undisputed record evidence shows that Plaintiff simply failed to meet the standards and procedures set up by the University to earn his degree, despite ample accommodations and attempts by the University to ensure his success. "When Yosaf plagiarized his First Thesis Proposal, he was allowed to continue in the program despite the seriousness of this offense. When Yosaf failed his Second Thesis Proposal, he was allowed to re-submit it until he passed. When Yosaf missed deadline after deadline associated with his First Dissertation Defense, he was given repeated extensions of time and virtually non-stop, specific advice from his advisor regarding corrections needed in the dissertation. When Yosaf failed his First Dissertation Defense, he was given an extension of his immigration status, yet another extension of time to complete the Ph.D. program, a new dissertation defense committee, and a second chance to defend. . . . Yosaf was likewise repeatedly warned about the impending expiration of the applicable statute of limitations and his related immigration status, told expressly over and over again that if he could not pass his dissertation defense by the deadline, the University would be left with no choice but to dismiss him from the Ph.D. program." ECF No. 49 at 21. Ultimately, Plaintiff did not meet the final and unappealable step, and so, as Defendant puts it, the University reasonably and understandably dismissed him from the program.

Plaintiff argues that the *prima facie* elements are met here: (1) Plaintiff is an ethnic or national minority, a protected class, (2) who was qualified to remain in Defendant's program to

attempt to earn his degree, (3) who was dismissed from the program, and (4) this adverse action occurred under circumstances that give rise to an inference of discriminatory intent.

The specific circumstances that Plaintiff argues suggest discrimination include: "Plaintiff being assigned an academic advisor that accused him of plagiarism, the intentional formation of a defunct doctoral committee, repeated threats of dismissal and revocation of his visa, and the deliberate disregard of multiple complaints of discrimination and unfair treatment." ECF No. 55 at 25. The Court has identified two particular allegations in the record that can potentially speak to the question of discriminatory intent, rather than adverse action alone. First, Dr. Harries gave a class in the Fall 2011 semester that included a discussion on the September 11, 2001 attack on the World Trade Center, during which Plaintiff "felt like Dr. Harries singled him out by looking at him directly during the discussion," ECF No. 55 at 27. Second, in his Deposition, Dr. Harries mentioned that Plaintiff's "general presence" intimidated people at the University. As Plaintiff's counsel puts it, "Undoubtedly, Plaintiff's ethnicity and national origin are fundamental to his 'general presence.'" *Id.* at 28.

Frankly, Plaintiff's assertions, implied or otherwise, require too much of the Court's imagination to support a finding of discriminatory intent. Students and instructors innocently catch each other's eyes too often and too randomly for this to be a serious consideration supporting the burden placed on Plaintiff. Further, Plaintiff's counsel's editorializing on the alleged deeper meaning of the phrase "general presence" does not sway the Court. Most importantly, these allegations and insinuations are not adequately, if at all, related to the adverse action that gives rise to this cause of action. Otherwise, the Court does not see any assertion of discrimination to satisfy Plaintiff's *prima facie* case, either directly or circumstantially. The basic set of facts here is that Plaintiff is an ethnic minority who did not receive a benefit he

wanted. But those two facts do not appear to be related, and Plaintiff has not made a showing, or asserted adequate allegations, that they are. The *prima facie* case has not been met.

Had Plaintiff met this burden, he would still not have satisfied the burden shifting scheme under *McDonnell Douglas*. Defendant has proffered a non-discriminatory reason for its decision, namely, that the University found Plaintiff's work unsatisfactory, gave him ample chances to correct deficiencies, and eventually made the internal decision to dismiss him. This would shift the burden back to Plaintiff to provide some evidence that the University's decisions were a pretext for discrimination. The Court can imagine (though perceives neither evidence nor allegations in the instant matter of) a situation where a hypothetical school, teeming with racists and xenophobes, places so many unfair barriers on minority students that they, through no fault of their own, simply cannot practically complete their assignments on time. For a university to argue that despite such a practice, it can rely on its prescribed deadlines as a reason to withhold a degree, would strike the Court as a pretext for discrimination. However, Plaintiff has not shown that he received harsher treatment than his peers due to his ethnicity or national origin, an essential component of the argument that the University's otherwise straightforward judgment is actually a pretext for discrimination. The fact is, Plaintiff received several accommodations, extensions, and granted appeals, which, if not individually, certainly collectively strike the Court as quite charitable. Even if, as Plaintiff points out, these were the fair and correct response from the University, given that it found that Plaintiff had not plagiarized and that the first committee was improperly formed, this at the very least shows fairness on the University's part, not discrimination. That "no other student has made it as far as Plaintiff in the Defendant's Civil and Environmental Engineering doctoral program, and not received their doctoral degree" may simply be due to the quality of Plaintiff's work, not discrimination. ECF No. 55 at 2. In fact, by

this Court's reasoning, this assertion works against the pretext argument, as it implies that not a single student of Arab descent or Libyan nationality has faced the sort of purported discrimination that Plaintiff alleges. Had Plaintiff made the Court aware of a pattern, wherein only students of Arab descent, or even only students who are members of ethnic or racial minority groups, have been subjected to this sort of treatment, perhaps the Court would see the inference that Plaintiff is attempting to demonstrate. But the assertion that just one student in the program's history has had this experience does not give rise to the inference that these otherwise non-discriminatory actions are pretextual.

To the degree that it can, the Court attempts to be receptive to the possibility that what looks like innocent behavior can be motivated by prejudice. But even with such an open mind, the Court not only sees no evidence in the record of clear discrimination, but also perceives inadequate allegation of facts to give rise to such an inference. There is nothing suspicious here. On such weak footing, the Court is not ready to question a school's academic review process, respecting a science that is, in no small measure, inherently imprecise and subject to an understandably large degree of discretion based on innumerable factors that do not relate to the ethnic backgrounds of the students.

The facts shown and alleged do not support a finding that the adverse action taken against Plaintiff gives rise to an inference of discrimination. As such, as to the Discrimination claim under Title VI, the Court will grant the Motion.

**B. Counts II & III – Retaliation Under Title VI and Section 1983**

Plaintiff brings claims for Retaliation under Title VI and Section 1983, arguing that he was dismissed from the University because he complained of discrimination. Defendant moves for summary judgment arguing that the Retaliation claim fails because the timing of the adverse

action does not fit the "after or contemporaneously" standard and because there is no causal link between the adverse action and the protected activity.

To establish a *prima facie* case for Retaliation under Title VI, a plaintiff must show that they were: (1) "engaging in a protected activity; (2) [the school] subjected [them] to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 522 (3d Cir. 2011). "[T]he elements of [a] Title VI retaliation claim are the same as [a] § 1983 retaliation claim." *Davis v. Quaker Valley Sch. Dist.*, No. 13-1329, 2016 WL 912297 (W.D. Pa. Mar. 10, 2016), *aff'd*, 693 F. App'x 131 (3d Cir. 2017) (citing Whitfield, 412 F.App'x at 522).

Even if there appears to be a temporal link between the protected activity and the adverse action, "the mere fact that adverse . . . action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006). Indeed, "timing alone will not suffice to prove retaliatory motive." *Delli Santi v. CNA Ins. Co.*, 88 F.3d 192, 199 n. 10 (3d Cir. 1996). Instead, courts use a "timing plus" standard, that accounts for the timing of the adverse action after the protected activity, plus the record evidence as a whole, to infer causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

Assuming that Plaintiff's complaint of discrimination in his January 2020 appeal to the provost's office was a protected activity, it does not seem reasonable, from the record as a whole, to consider Plaintiff's ultimate dismissal from the program causally linked to this protected activity. Prior to his protected complaint, Plaintiff had been repeatedly warned of the

consequences for not meeting his deadlines. It is within this context, knowing how failure to defend his thesis would play out, that Plaintiff leveled his complaint. At the time of his complaint, Plaintiff was facing a less desirable and more adverse outcome than what ultimately occurred. He had just failed to defend his dissertation defense. After he leveled the complaint of discrimination, Plaintiff's appeal was granted, and a new defense committee was formed. In June 2020, after Plaintiff learned that he had failed to defend his thesis for a second time, and knew the consequences he faced for this failure, he leveled another complaint of discrimination. This time, his appeals were denied. Any temporal proximity between the protected activity and the adverse action appears to be because Plaintiff exercised the protected activity after he learned that he had failed to defend his thesis and knew, based on prior warning, that an adverse action was all but inevitable.

The facts show that the adverse action taken against Plaintiff does not suggest a causal link to the protected activity. As such, as to the Retaliation claims under Title VI and Section 1983, the Court will grant the Motion.

## IV. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment will be granted in its entirety.

BY THE COURT:

*/s/Robert J. Colville*_______
Robert J. Colville
United States District Judge

DATED: September 23, 2026

cc: All counsel of record,